IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CHIOS ISLAND SHIPPING & TRADING S.A., § § § | | |
| Plaintiff, § § | | |
| v. § § | CIVIL ACTION NO. H-11-2766 | |
| MGI MARINE, LLC, B.L. DARNELL, her engines, tackle, etc., in rem, and CHERYL K, LLC, in personam, § § § § § § | | |
| Defendants. § | | |

**MEMORANDUM AND RECOMMENDATION**

Pending before the court[1] is Defendant Bominflot Bunker Oil Corporation's Motion for Summary Judgment (Doc. 67). The court has considered the motion, the response thereto, all other relevant filings, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Defendant's motion for summary judgment be **GRANTED**.

**I. Case Background**

Plaintiff Chios Island Shipping & Trading S.A. ("Plaintiff") filed suit against multiple defendants for damages sustained as a result of the discharge of oil into the Galveston Ship Channel during a fueling operation. Plaintiff filed a breach of contract claim against Defendant Bominflot Bunker Oil Corporation

---

[1] This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. Doc. 46.

("Defendant"), alleging that the spill was caused by fuel being pumped at a speed in excess of a contractually agreed upon rate.

## A. Factual Background

On February 2, 2009, Archer Daniels Midland Company ("ADM") chartered the M/V Chios Liberty from Plaintiff, the vessel's owner.[2] ADM operated the M/V Chios Liberty under a standard time charter, meaning ADM had exclusive use of the M/V Chios Liberty for a set period of time, during which ADM could undertake as many voyages as it saw fit.[3] Under the agreement, Plaintiff continued to navigate, operate, and manage the vessel on behalf of ADM.[4] ADM's responsibilities included the obligation to pay and provide for the vessel's fuel, also known as bunkers.[5]

World Fuel Services ("WFS"), serving as ADM's broker, negotiated with Defendant for the purchase of bunkers to be delivered while the M/V Chios Liberty was docked in the Port of Galveston.[6] Defendant agreed to provide seventy metric tons of marine diesel oil and four hundred and ninety metric tons of

---

[2] See Doc. 70-3, Ex. C to Def.'s Reply to Pl.'s Resp. to Def.'s Mot. for Summ. J., Time Charter Addendum Number One p. 1; Doc 70-4, Ex. D to Def.'s Reply to Pl.'s Resp. to Def.'s Mot. for Summ. J., Time Charter.

[3] See Doc. 70-4, Ex. D to Def.'s Reply to Pl.'s Resp. to Def.'s Mot. for Summ. J., Time Charter pp. 2-3.

[4] See id. pp. 2-3, 5, 7.

[5] See id. p. 2.

[6] See Doc. 68, Ex. B-1 to Def.'s Mot. for Summ. J., Dep. of Robert Lake pp. 17-20; Doc. 68, Ex. B-2 to Def.'s Mot. for Summ. J., WFS's Confirmation.

intermediate fuel oil ("IFO 180").[7] ADM and WFS finalized the negotiations with an exchange of emails on July 15 and 16, 2009.[8] WFS's email sent to Defendant identified "Archer Daniels Midland Co" as the buyer.[9] Defendant's confirmation indicated that the fuel was supplied on account of "Master a/o Owner a/o Charterer a/o Operator a/o Manager a/o mv 'Chios Liberty' a/o Messrs Archer Daniels Midland."[10]

Defendant retained MGI Marine, LLC ("MGI") to perform the bunkering operations.[11] MGI provided a bunker barge, the delivering facility of the bunker fuels, and a tug, the B.L. Darnell ("BLD"), which it had chartered from Cheryl K, LLC ("Cheryl K") to transport and direct the bunker barge.[12]

On July 19, 2009, the day of the transfer, the M/V Chios Liberty's chief engineer signed the delivery receipt and stamped the receipt as delivered.[13] The chief engineer also signed and

---

[7] See Doc. 68, Ex. B-2 to Def.'s Mot. for Summ. J., WFS's Confirmation.

[8] See id.; Doc. 68, Ex. B-3 to Def.'s Mot. for Summ. J., Def.'s Confirmation.

[9] See Doc. 68, Ex. B-2 to Def.'s Mot. for Summ. J., WFS's Confirmation.

[10] See Doc. 68, Ex. B-3 to Def.'s Mot. for Summ. J., Def.'s Confirmation.

[11] See Doc. 69-1, Ex. 2 to Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J., Marine Services Contract Between MGI and Def.

[12] See Doc. 69-1, Ex. 3 to Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J., Charter Hire Agreement Between BLD and MGI; Doc. 69-1, Ex. 7 to Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J., Dep. of Mark Mitchell pp. 15, 20-23.

[13] See Doc. 69-1, Ex. 6 to Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J., Bunker Delivery Receipt.

stamped an "Introduction Letter" and a "Declaration of Inspection Prior to Bulk Cargo Transfer."[14] These three documents included terms set forth in the confirmation emails between WFS and ADM, in addition to stipulating that the IFO 180 was to be pumped at a rate of two hundred metric tons per hour.[15] A tankerman employed by Cheryl K also signed the documents: the introduction letter on behalf of Defendant; the delivery receipt on behalf of the "seller/transporter;" and the declaration of inspection as the "Person in Charge - Barge."[16] Transfer of the IFO 180 began at 10:15 a.m. and continued for approximately forty minutes, at which point the bunker equipment was shut down after oil began overflowing from the tank.[17]

## B. Procedural Background

On July 28, 2011, Plaintiff filed a complaint asserting claims of negligence against MGI, BLD, and Cheryl K, seeking recovery for damages sustained as a result of the oil spill, primarily response

---

[14] See Doc. 69-1, Ex. 4 to Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J., Declaration of Inspection; Doc 69-1, Ex. 5 to Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J., Introduction Letter.

[15] See Doc. 69-1, Ex. 6 to Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J., Declaration of Inspection; Doc. 69-1, Ex. 5 to Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J., Introduction Letter.

[16] See Doc. 69-1, Ex. 7 to Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J., Dep. of Mark Mitchell p. 15; Doc. 69-1, Ex. 6 to Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J., Bunker Delivery Receipt; Doc. 69-1, Ex. 4 to Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J., Declaration of Inspection; Doc. 69-1, Ex. 5 to Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J., Introduction Letter.

[17] See Doc. 69-1, Ex. 7 to Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J., Dep. of Mark Mitchell pp. 55-56.

costs and civil penalty assessments.[18] Plaintiff filed an amended complaint on May 29, 2012, asserting additional breach of contract claims against MGI, BLD, and Cheryl K, as well as Defendant, alleging that the overflow resulted from the fuel being pumped at a speed significantly faster than the agreed upon maximum.[19] On July 5, 2013, Defendant filed a motion for summary judgment.[20] Plaintiff responded on July 26, 2013.[21] Defendant filed a reply on August 13, 2013, to which Plaintiff filed a surreply on August 19, 2013.[22]

## II. Summary Judgment Standard

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Brown v. City of Houston, Tex., 337 F.3d 539, 540-41 (5th Cir. 2003). A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 271 F.3d 624, 626 (5th

---

[18] See Doc. 1, Pl.'s Orig. Compl.

[19] See Doc. 31, Pl.'s 1st Am. Compl.

[20] See Doc. 67, Def.'s Mot. for Summ. J.

[21] See Doc. 69, Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J.

[22] See Doc. 70, Def.'s Reply to Pl.'s Resp. to Def.'s Mot. for Summ. J.; Doc. 77, Pl's Surreply to Def.'s Mot. for Summ. J.

Cir. 2001).  To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party.  <u>Anderson</u>, 477 U.S. at 250; <u>TIG Ins. Co. v. Sedgwick James of Wash.</u>, 276 F.3d 754, 759 (5th Cir. 2002).

The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues.  <u>Celotex Corp.</u>, 477 U.S. at 323; <u>Topalian v. Ehrman</u>, 954 F.2d 1125, 1131 (5th Cir. 1992).  If the moving party can show an absence of record evidence in support of one or more elements of the case for which the nonmoving party bears the burden, the movant will be entitled to summary judgment.  <u>Celotex Corp.</u>, 477 U.S. at 322.  In response to a showing of lack of evidence, the party opposing summary judgment must go beyond the pleadings and proffer evidence that establishes each of the challenged elements of the case, demonstrating that genuine issues of material fact do exist that must be resolved at trial.  <u>Id.</u> at 324.

When considering the evidence, "[d]oubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party."  <u>Evans v. City of Houston</u>, 246 F.3d 344, 348 (5th Cir. 2001); <u>see also</u> <u>Boston Old Colony Ins. Co. v. Tiner Assocs. Inc.</u>, 288 F.3d 222, 227 (5th Cir. 2002).  The court

should not "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence." Honore v. Douglas, 833 F.2d 565, 567 (5th Cir. 1987).

However, the nonmoving party must show more than "some metaphysical doubt as to the material facts." Meinecke v. H & R Block of Houston, 66 F.3d 77, 81 (5th Cir. 1995). Conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation, or only a scintilla of evidence will not carry this burden. Brown, 337 F.3d at 541; Ramsey v. Henderson, 286 F.3d 264, 269 (5th Cir. 2002). The court must grant summary judgment if, after an adequate period of discovery, the nonmovant fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

### III. Analysis

Defendant moves for summary judgment on Plaintiff's breach of contract claim on the grounds that Plaintiff was neither a party to nor a third-party beneficiary of the bunkering contract and therefore may not sue on the contract.[23]

---

[23] Defendant first raised this argument in its reply. Plaintiff contends that Defendant's argument should be stricken on the basis that a reply is not the proper place for asserting new arguments for summary judgment. Although courts generally will not consider arguments raised for the first time in a reply, no "palpable injustice" exists where the opposing party is given a chance to respond through a surreply. See Blanchard & Co., Inc v. Heritage Capital Corp., No. 3:97-CV-0690-H, 1997 WL 757909, at *1 (N.D. Tex. Dec 1, 1997) (unpublished). Here, the court granted Plaintiff's motion for leave to file a surreply.

In its amended complaint, Plaintiff claimed both that it had entered into a contract with Defendant for the provision of bunkers and that it was "also an intended third-party beneficiary of the contract(s)."[24] In its response to the pending motion for summary judgment, Plaintiff "clarifie[d] that its breach of contract claim . . . [was] being asserted in its capacity as an intended third-party beneficiary" of a contract entered into by ADM and Defendant.[25]

Under the third-party beneficiary theory, contracting parties may create rights in favor of a non-contracting third party by manifesting an intention to do so.[26] Restatement (Second) of Contracts §§ 302, 315 (1981) (Stating that "intended" third-party beneficiaries of contracts may seek enforcement of the contract; "incidental" beneficiaries may not). "A promise must be made directly for the benefit of a third party to support a claim by that third party under the contract." Atl. & Gulf Stevedores, Inc. v. Revelle Shipping Agency, Inc., 750 F.2d 457, 459 n.3 (5th Cir. 1985).

---

Accordingly, the court considers the argument.

[24]    See Doc. 31, Pl.'s 1st Am. Compl. p. 3.

[25]    See Doc. 69, Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. pp. 4-5.

[26]    Neither party briefed the issue of whether Texas law or federal maritime law should govern the contract; both parties cited both sets of law. The analysis appears to be the same under both. See BP Oil Int'l, Ltd. v. Empresa Estatal Petroleos de Ecuador (Petroecuador), No. 04-20911, 2008 WL 162889, at *3 (5th Cir. Jan 16, 2008) (unpublished). The court applies federal maritime law.

The contract in the present case evinces no intent to directly benefit Plaintiff; nor was any direct benefit conferred. The time charter is routine practice in the marine transport industry. <u>Sagaan Developments & Trading Ltd. v. Quail Cruises Ship Mgmt.</u>, No. 11-23873-CIV 2013 WL 2250793, at *5 (S.D. Fla. May 22, 2013) (unpublished). "The general scheme of a time charter is that the owner turns over a fully equipped ship to the charterer and operates the ship for the charterer's benefit, being compensated by monthly hire." <u>Marcial Ucin, S.A. v. SS Galicia</u>, 723 F.2d 994, 998 (1st Cir. 1983). Typically, "the owners pay the crew wages and supply their food, pay for engine room stores, keep the vessel repaired and pay for insurance[;] *almost everything else falls upon the charterer*." <u>Id.</u> (internal quotation marks omitted). Under ADM's charter agreement with Plaintiff, ADM explicitly undertook responsibility for "provid[ing] and pay[ing] for all the bunkers except otherwise agreed."[27] Consistent with this provision, ADM, through its broker WFS, negotiated and executed the purchase of bunkers from Defendant.[28]

The documents effecting this purchase did not indicate that either party had the intention of benefitting Plaintiff. Plaintiff points to Defendant's confirmation of the bunker sale, addressed to

---

[27] <u>See</u> Doc. 70-4, Ex. D. to Def.'s Reply to Pl.'s Resp. to Def.'s Mot. for Summ. J., Time Charter p. 2.

[28] <u>See</u> Doc. 68, Ex. B-2 to Def.'s Mot. for Summ. J., WFS's Confirmation; Doc. 68, Ex. B-1 to Def.'s Mot. for Summ. J., Dep. of Robert Lake pp. 17-20.

WFS, which noted that the fuel was supplied on account of "Master a/o Owner a/o Charterer a/o Operator a/o Manager a/o mv 'Chios Liberty' a/o Messrs Archer Daniels Midland," and an invoice sent to ADM from Defendant addressed to "Master and/or owner and/or charterer and/or operator and/or manager of mv Chios Liberty."[29] Plaintiff does not dispute Defendant's contention that there is no evidence that copies of these confirmations were sent to Plaintiff. Regardless, even if understood to refer to Plaintiff as well as ADM, these documents do not demonstrate an intention to benefit Plaintiff. Plaintiff also calls attention to references to the M/V Chios Liberty in the purchase documents as indicative of Plaintiff's third-party beneficiary status. These references indicate only that the M/V Chios Liberty was the vessel that received the fuels; they do not reveal the parties' intention to benefit Plaintiff.

Citing no case law, Plaintiff argues, in essence, that, simply because the purchase involved the M/V Chios Liberty, Plaintiff, as the vessel's owner, was an intended beneficiary of the transaction.[30] On the contrary, while Plaintiff may, by virtue of

---

[29] See Doc. 68, Ex. B-3 to Def.'s Mot. for Summ. J., Def.'s Confirmation; Doc. 69-1, Ex. 1 to Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J., Invoice from Def.

[30] Plaintiff asserts that Defendant's obligation to provide bunkers was "clearly and unequivocally intended to benefit Plaintiff, the owner of the vessel receiving the fuel oils," continuing, "Who else could the parties have possibly intended to benefit with these contractual provisions, other than the vessel destined to receive the fuel oils?" See Doc. 77, Pl.'s Surreply to Def.'s Mot. for Summ. J. p. 5 & n.22.

owning the vessel, stand as an incidental beneficiary, this fact alone does not make Plaintiff an intended beneficiary.

Maersk Line Ltd. v. Care, 271 F. Supp. 2d 818 (E.D. Va. 2003) is instructive. In that case, a charterer contracted with a grain supplier for grain that became infested with live insects, resulting in the vessel being quarantined for fumigation. See Maersk Line Ltd., 271 F. Supp. 2d at 820-21. The shipowner sought recovery against the grain supplier for the delay and the costs of fumigation, arguing that it was the intended beneficiary of the contract to supply the grain. See id. at 821, 825. The court found that "even under the most liberal analysis, [the shipowner could not] be said to have been an intended beneficiary of the [contract]." Id. at 825. The court concluded that "[i]t defies logic to imagine that, in contracting with [the supplier] to purchase grain for shipment, the intention of [the charterer] was to provide a benefit to the vessel that it hired to ship the grain. [The shipowner's] benefit was entirely incidental to the ultimate goal of [the charterer] - to deliver grain." Id.

Using the same rationale, the court in River Docks, Inc. v. J. Gerber, Inc., No. 08-689, 2009 WL 498520, *5-9 (E.D. La. Feb. 25, 2009) (unpublished) held that a shipowner was not an intended beneficiary of a charter agreement between a charterer and a subcharterer. The court explained that "[a]lthough the Charter mention[ed] Owners multiple times and convey[ed] some rights and

11

responsibilities to Owners, those rights [were] incidental to the purpose of chartering the barges to [the subcharterer] and [the subcharterer's] promise to pay charter hire to [the charterer]." River Docks, 2009 WL 498520, at *8.

In the case at hand, whatever benefit Plaintiff may have received was incidental to the purpose of providing fuel so that ADM could operate the vessel it had chartered. As it is not a third-party beneficiary, Plaintiff has no standing to sue for breach of contract. Therefore, the motion for summary judgment should be granted.[31]

### IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that Defendant's motion for summary judgment be **GRANTED.**

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such

---

[31] Because of the court's conclusion, the court does not reach Defendant's additional arguments.

12

objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 7th day of October, 2013.

Nancy K. Johnson
United States Magistrate Judge